IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONNA JAINLETT,                    :    CIVIL ACTION
                                   :    NO. 06-4196
          Plaintiff,               :
                                   :
          v.                       :
                                   :
CVS CORPORATION t/a                :
CVS PHARMACY,                      :
                                   :
          Defendant.               :
                                   :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                           JULY 30, 2008


          Donna Jainlett sues CVS Corporation ("CVS"), her former
employer, alleging race and gender discrimination.  Jainlett
claims that, while working at CVS, she was sexually harassed by a
co-worker, and that CVS had notice of, but failed to adequately
respond to, the harassment.  She further alleges that CVS
retaliated against her after she complained of the sexual
harassment because of her sexual harassment complaint and an
earlier complaint of racial discrimination that she made to CVS.[1]

_____

[1]   Although Jainlett references this earlier complaint of
racial discrimination and the events giving rise to it in her
motion for summary judgment, she made clear in her complaint and
her Equal Employment Opportunity Commission ("EEOC") charge that
the claims in this lawsuit arise only out of the sexual
harassment she suffered and the events that followed her
complaint of sexual harassment.  See Cmplt. ¶ 8; EEOC Charge, Ex.
S, Def.'s Mot. Summ J.

-1-

The Complaint asserts claims under Title VII, 42 U.S.C. § 2000e[2];
the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the
Pennsylvania Human Relations Act.[3]  For the reasons that follow,
CVS's motion for summary judgment will be granted in part and
denied in part.

I.   BACKGROUND

        Donna Jainlett was hired by CVS as a cashier in fall
2003.[4]  At the time of her hiring, she worked at CVS Store 2157,

--------

        [2]   Jainlett's complaint cites 42 U.S.C. § 2000e-2 in
Counts I and II.  However, Count II, which alleges that Jainlett
was retaliated against, will be analyzed under § 2000e-3, which
specifically addresses retaliation.  Although neither party
points out the error in the Complaint, both parties apply 2000e-3
and the law governing retaliation to Count II in their arguments
regarding summary judgment.

        [3]   The Pennsylvania Human Relations Act is to be
interpreted as identical to federal anti-discrimination laws
except where there is something specifically different in its
language indicating it is to be interpreted differently.  Fasold
v. Justice, 409 F.3d 178, 184 n.8 (3d Cir. 2005).  The parties
agree that the PHRA applies in this case identically to the
federal statutes relied on by Jainlett.  Therefore, to the extent
that summary judgment is granted as to Jainlett's claims under
federal law, summary judgment will be granted as to her claims
under the PHRA.  To the extent that summary judgment is denied as
to Jainlett's federal claims, it will also be denied as to her
state claims.

        [4]   The parties disagree as to exactly when Jainlett became
employed by CVS.  Defendant states that Jainlett applied for
employment on November 17, 2003 and began working at some point
after that.  Def.'s Mem. Summ. J. 3 & n.3.  Plaintiff states, in
her memorandum opposing summary judgment, that she began working
for CVS in September 2003.  Pl.'s Opp. Summ. J. 2.  The Complaint
alleges that Jainlett began working in October 2003.  Cmplt. ¶
11.  This dispute is immaterial to the outcome of the motion for

located at 10th Street and Washington Avenue in Philadelphia.
Jainlett Dep. 70:14-20.  It is undisputed that, while at Store
2157, Jainlett received a number of verbal and written warnings
for arriving late and missing shifts.  <u>See, e.g.</u>, Exs. G-H,
Def.'s Mot. Summ. J; Jainlett Dep. 106:13-14, 121:5-7, 123:6-10.

     In late August or early September 2004, Jainlett
complained that she was being discriminated against on the basis
of race.[5]  After this complaint, a meeting took place between
Jainlett, Marlin Eroh, CVS's Human Resources Manager, and Darren
Smith, CVS's District Manager.  Jainlett testified that both
managers yelled at her because of her lateness to work, to the
extent that she began crying and shaking.  Jainlett Dep. 147:1-
10, 148:18-22.  Jainlett told them that the lateness reports were
made up, but they did not listen.  <u>Id.</u>  At the end of the
meeting, Jainlett requested that she be transferred to another
CVS store.

     On October 3, 2004, while she was still working at
Store 2157, Jainlett received a written warning regarding
attendance problems.  Ex. I, Def.'s Mot. Summ. J.  According to
the warning, she was 50 minutes late for a shift on October 1,

---

summary judgment.

     [5]     Although Jainlett's memorandum opposing summary
judgment includes facts about this alleged discrimination, the
Complaint does not include any allegations regarding racial
discrimination.  It claims only that CVS retaliated against
Jainlett for complaining of racial discrimination.

2004, and missed a shift without notifying CVS on October 3, 2004.  Id.  The warning stated that "immediate termination of employment [would] result if all attendance guidelines [we]re not followed."  Id.  Jainlett refused to sign the warning to acknowledge that she understood its contents.  Id.

On October 17, 2004, Jainlett was transferred to Store 1913, at 10th and Reed Streets in Philadelphia.  Jainlett Dep. 155:2-4.  Whether or not the manager of Store 1913, Anthony Chichearo, was aware of the reason for Jainlett's transfer is in dispute.  CVS claims that he was not told about Jainlett's discrimination complaint, but was only told that there had been a problem at Jainlett's previous store.  Jainlett argues that Chichearo must have been aware of her complaint because of the geographic proximity of Stores 1913 and 2157, and because employees of the two stores sometimes substituted for one another at work or socialized together.

At some point after being transferred to Store 1913, Jainlett complained to CVS that she was being sexually harassed. The parties' versions of when her complaint took place and what happened following the complaint differ significantly.


A.    Plaintiff's Version of Events

Jainlett testified that, in November 2004, she complained to a supervisor named Margaret that she was being

-4-

sexually harassed by William Giles, a security guard at Store 1913.[6]  Jainlett Dep. 187.  According to Jainlett, Giles harassed her at the store by taking a box of condoms off a shelf and telling her to look at them; by staring at her continuously; by giving her a greeting card after she made clear that she was not interested in any relationship with him outside the workplace; and by repeatedly offering her a ride on his motorcycle even after she made clear that she was not interested.  Additionally, he compared her physically to popular singer Beyonce Knowles; he referred to her as his "buddy"; he simulated spanking her while telling coworkers that "this is how you treat a woman"; and, in the employee break room in front of others, he made other comments about the treatment of women.

      At one point, Jainlett testified that Margaret

---

      [6]     Jainlett's position on the timing of her complaint varies.  See, e.g., Jainlett Dep. 223:3-6 (testifying that she complained of sexual harassment in November 2004); id. at 187:1-10 (testifying that she first notified management of the harassment in October 2004); Pl.'s Mem. Opp. Summ. J. 9 (asserting that Jainlett first complained in December 2004).  At her deposition, at one point she testified that she initially complained in October, but her final testimony was that she first complained in November.  Jainlett Dep. 223:3-6.
      In some instances, Jainlett's brief differs from her deposition testimony.  See, e.g., Pl.'s Mem. Opp. Summ. J. 10 (citing transcript for proposition that Jainlett complained to CVS supervisor Margaret in December 2004 where actual testimony in the pages cited was that she complained to Margaret in late October or November).  Where the brief differs from Jainlett's deposition testimony, the Court relies on the testimony.

requested that Jainlett put her complaint in writing.[7]  Id. at
189:17-21.  However, Jainlett later testified that she never
provided Margaret with any written statement.  Id. at 216:9-11.
At a minimum, Jainlett complained orally to Margaret, who
notified Tony Chichearo of the complaint.  Chichearo then
contacted Jainlett and told her that a meeting would be scheduled
with regional managers to discuss the situation.  Id. at 192:3-9.
Jainlett requested that she not be assigned to work with Giles in
the future.  Id. at 192:14-15.

During the conversation, Chichearo told Jainlett to
take four days off while he investigated the situation.  Id. 222-
23.  Therefore, Jainlett stayed home from work without pay on
four occasions in November following her complaint of harassment.
Id. at 223:3-8.  She believes that these days were during the
second week of November.  Id. at 225:12-13.  When Jainlett
complained that she was losing income because of her missed
shifts, Chichearo replied that she should get some rest because

---

[7]     During her deposition, Jainlett exhibited uncertainty
as to whether Defendant's Exhibit Q is a copy of the document she
submitted to Margaret.  Exhibit Q is a document in Jainlett's
handwriting that records some of Jainlett's interactions with
Giles.  Initially, Jainlett testified that Exhibit Q was
submitted to Margaret after Jainlett complained to her about the
harassment.  Later, Jainlett testified that Exhibit Q is a set of
notes that she prepared in December 2004 for her own use.  She
stated that she never provided the notes to CVS and does not know
how CVS came to possess a copy of the document.  Jainlett Dep.
202:24-203:11, 197:19-21.  Still later, Jainlett testified that
Exhibit Q is a document that she prepared at the request of Tony
Chichearo and that she turned over to him.  Id. at 230:21-24.

-6-

she had been through an ordeal.  Id. 223:7-14.

Jainlett returned to CVS on Monday during the third week of November 2004.  On that day, she was instructed by Karen Bellingham, assistant store manager, to leave early because Giles was coming to work.  Id. at 226:4-12.  Therefore, Jainlett was only paid for half a day of work.  Id. at 227:11-12.

Jainlett testified that it "seemed like" her hours were reduced by CVS after the third week of November.  Id. at 227:12. Before her complaint, she had worked something less than 20 hours per week.[8]  Id. at 228:12-14.  No time records for the month of November have been produced, but Jainlett testified that she remembers that, in three of the reduced weeks, she worked 11, 16, and 18 hours.  Id. at 228:19-23.

At some point in late November or early December, Jainlett met with Chichearo to discuss her complaint.  Id. at 230:18-20.  Chichearo asked Jainlett to put her complaint in writing, which she did.[9]  See Ex. Q 1-2, Def.'s Mot. Summ. J.

_____

[8]     The maximum number of hours that Jainlett could have worked in any week during her time at CVS was 20 because Jainlett was collecting unemployment payments throughout her employment at CVS.  Jainlett Dep. 228:12-14.

[9]     As previously noted, Jainlett exhibited uncertainty as to whether Exhibit Q is the document that she turned over to Chichearo.  See supra note 7.  However, her final testimony on the question appears to be that the first two pages of Exhibit Q were provided to Chichearo at his request.  Jainlett Dep. 230:21-24.  CVS agrees that Chichearo received a written statement from Jainlett and that Exhibit Q is that statement.

(referred to as Jainlett 7 during Jainlett's deposition);
Jainlett Dep. 230:21-24.  During her conversation with Chichearo
and in the writing she provided to him, Jainlett identified the
co-workers who she believed had witnessed Giles's harassment of
her.  Jainlett Dep. 233.  Chichearo told her that he would give
her written statement to CVS's regional manager and get back to
her about the situation.  Id. at 231:9-11.  At this point,
Jainlett revealed to Chichearo what had happened at Store 2157.
She explained that she would not meet with Martin and Eroh
because she had previously had an unpleasant experience with
them.  Id. at 231:13-22.

At some point following his conversation with Jainlett,
but still during December, Chichearo told Jainlett that he had
spoken to Giles about the situation and that Giles had denied
Jainlett's allegations.  Id. at 236:2-11.

On December 29, 2004 and January 5, 2005, Jainlett
called CVS to cancel shifts that she had been scheduled to work.
Ex. N, Def.'s Mot. Summ. J.; Jainlett Dep. 246:14-20.

On January 6, 2005, Marvin Eroh and Darren Smith
visited Store 1913.[10]  They questioned Giles about Jainlett's
allegations, which he denied.  Regardless of this denial, Eroh

---

[10]    Jainlett initially testified that the meeting took
place in late December, but she admitted that it was possible
that the meeting took place on January 6, 2006.  Jainlett Dep.
239:3-8.  CVS's records show that the meeting took place on
January 6, 2005. Ex. R, Def.'s Mot. Summ. J.

reviewed CVS's sexual harassment policy with Giles and warned him
that disciplinary action would be taken if he did not comply with
the policy.  Eroh and Smith also attempted to meet with Jainlett
and Chichearo to discuss her allegations, but she refused to meet
with them.  Jainlett again told Chichearo that she did not wish
to meet with Eroh and Smith because they had been involved the
complaint at Store 2157 that had led to her being transferred.
Chichearo Dep. 101:20-24, 102:15-20.

On January 11, 2005, Jainlett again canceled a shift
that she had been scheduled to work.  Ex. N, Def.'s Mot. Summ.
J.; Jainlett Dep. 246:14-20.

On January 13, 2005, another meeting took place between
Jainlett and Chichearo.  Ex. N, Def.'s Mot. Summ. J.; Jainlett
Dep. 245:23-246:4.  According to Jainlett, Chichearo "became
angry" and berated her for refusing to attend the meeting on
January 6, 2005.  Jainlett Dep. 239:20-21.  Chichearo looked in
Jainlett's file from Store 2157 and said that all the problems
from her old store were being repeated at the new store.  Id. at
240:1-3.  When Jainlett asked what he meant by that, Chichearo
stated that Jainlett had recently missed three scheduled shifts
and that she had been late to work on multiple occasions.  Id. at
240:4-6.

Jainlett replied "[Chichearo] gave us three to five
minutes' grace time and that she always arrived at work within

-9-

that time.  Id. 240:7-10.  Chichearo responded that Jainlett's

arrival within what she described as the grace period was

considered a late arrival.  Id. at 241:3-6.

Chichearo gave Jainlett a written reprimand.  Ex. N,

Def.'s Mot. Summ. J.; Jainlett Dep. 245:6-10.  The reprimand

listed the occasions on which Jainlett failed to report for work

and stated that Jainlett had been late on multiple occasions in

the preceding month (mid-December to mid-January).  Ex. N.  It

also stated that she was being placed on "time and attendance

probation"--"Any future violations of CVS time and attendance

policy will result in disciplinary actions, up to and including

termination."  Id.  Jainlett refused to sign the reprimand.  Id.

She says she was not late on the occasions listed and cannot

recall whether she called out on the dates listed.  Jainlett Dep.

246:10-13, 18-20.

On January 15, 2005, Jainlett delivered a letter to CVS

stating that she was resigning her employment.  Jainlett Dep.

248:7-11.  Jainlett accepted an offer of employment from Super

Fresh grocery store on January 17, 2005.


B.   Defendant's Version of Events

Defendant maintains that the first complaint that

Jainlett made regarding sexual harassment was in late December

2004.  The manager to whom she complained requested that she put

the complaint in writing, which was done.  On December 30, 2004, Jainlett met with Chichearo to discuss the complaint.

Chichearo informed Marlin Eroh and Darren Smith of Jainlett's complaint on December 30, 2004.  He also interviewed the witnesses identified by Jainlett on December 30 and 31, 2004. None of the witnesses supported Jainlett's claims.  Jainlett canceled the shift she was scheduled to work on January 5, 2005, but reported for work on January 6, 2005, the day that Eroh and Smith visited the store.

CVS generally agrees with Jainlett's description of events from January 6, 2005 until Jainlett left CVS's employment. CVS agrees that Jainlett refused to attend the meeting with Eroh and Smith, that she failed to report for a number of shifts in January 2005 for which she had been scheduled, and that she received an attendance warning from Chichearo on January 13, 2005.  CVS also agrees that Jainlett submitted a resignation letter on January 15, 2005.


II.  MOTION FOR SUMMARY JUDGMENT

CVS moves for summary judgment on all claims.  It argues that it cannot be held liable for Giles's harassment of Jainlett because it took adequate remedial action immediately upon learning of the harassment.  It further argues that Jainlett has failed to produce evidence sufficient to support her claim of

retaliation.  The motion for summary judgment will be granted,
except with respect to Jainlett's claim that CVS retaliated
against her for her complaints of race and gender discrimination.


    A.   <u>Summary Judgment Standard</u>

       Summary judgment is proper when "the pleadings, the
discovery and disclosure materials on file, and any affidavits,
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  A fact is "material" if its existence or
non-existence would affect the outcome of the suit under
governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
248 (1986).  An issue of fact is "genuine" when there is
sufficient evidence from which a reasonable jury could find in
favor of the non-moving party regarding the existence of that
fact.  <u>Id.</u> at 248-49.  "In considering the evidence, the court
should draw all reasonable inferences against the moving party."
<u>El v. Se. Pa. Transp. Auth.</u>, 479 F.3d 232, 238 (3d Cir. 2007).

       "Although the initial burden is on the summary judgment
movant to show the absence of a genuine issue of material fact,
'the burden on the moving party may be discharged by showing-that
is, pointing out to the district court-that there is an absence
of evidence to support the nonmoving party's case' when the
nonmoving party bears the ultimate burden of proof."  <u>Conoshenti</u>

v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (quoting

Singletary v. Pa. Dept. of Corrections, 266 F.3d 186, 192 n.2 (3d

Cir. 2001)).  Once the moving party has thus discharged its

burden, the nonmoving party "may not rely merely on allegations

or denials in its own pleading; rather, its response must--by

affidavits or as otherwise provided in [Rule 56]--set out

specific facts showing a genuine issue for trial."  Fed. R. Civ.

P. 56(e)(2).


     B.    <u>Count I - Hostile Work Environment</u>[11]

     Jainlett claims that CVS is liable under Title VII for

Giles's sexual harassment of her because Giles created a hostile

work environment and CVS failed to intervene after learning of

Giles's conduct.[12]  CVS's motion for summary judgment will be

---

[11]    For purposes of analyzing this claim, the Court
resolves all issues of fact in favor of the non-moving party,
Jainlett.  Even assuming that the facts are as Jainlett described
them in her testimony, CVS is entitled to judgment as a matter of
law on Jainlett's claim for hostile work environment.

[12]    Jainlett also claims that racial discrimination on the
part of CVS supervisors created a hostile work environment.  In
support of this claim, her memorandum refers to events that took
place at Store 2157.  These references will be disregarded
because Jainlett's complaint and EEOC Charge explicitly limited
this case to events that took place at Store 1913.
    In further support of this claim, Jainlett cites her
testimony that, for four or five weeks when she worked at Store
2157, she was unable to pick up her paycheck in the same manner
as other employees.  According to Jainlett, CVS issued employee
paychecks on Fridays.  However, if an employee was working on
Thursday, that person was able to pick up her paycheck at the
office of the CVS store where she worked on Thursday, rather than

-13-

granted because Jainlett has failed to point to evidence sufficient to establish respondeat superior liability on the part of CVS.

      1.   Hostile work environment

     "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment," a hostile work environment exists and Title VII has been violated.  Id. (internal quotation and citation omitted).

---

waiting for Friday.  Jainlett testified that, unlike other employees, she was unable to pick up her paycheck on Thursdays. However, she also testified that when she told Joe, the floor manager, about her problem, he told her not to worry and then retrieved her paycheck from the office for her.
      Jainlett's testimony describes a minor inconvenience that was rectified by a CVS supervisor as soon as he was informed of it.  Jainlett has failed to provide evidence from which a jury could find that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [were] sufficiently severe or pervasive to alter the conditions of the victim's employment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

-14-

To establish a hostile work environment claim against CVS under Title VII, Jainlett must establish the following five elements: "(1) [she] suffered intentional discrimination because of . . . her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [Jainlett]; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) respondeat superior liability existed." Andreoli v. Gates, 482 F.3d 631, 643 (3d Cir. 2007); Knabe v. Boury Corp., 114 F.3d 407, 410 (3d Cir. 1997).

### 2.   Giles's conduct

For purposes of this motion, the parties do not contest that a jury could find in Jainlett's favor as to the first four elements of hostile work environment if it credits Jainlett's testimony regarding Giles's behavior.  However, CVS argues that it is entitled to summary judgment because Jainlett cannot point to evidence sufficient to allow a jury to find that the fifth element, respondeat superior liability, has been established.

An employer is not vicariously liable to a victim of sexual harassment when the harassment is done by a co-worker as opposed to a manager.  Id. at 411.  The employer will only be liable for its own behavior vis-a-vis the harassment.  Thus, Jainlett must establish CVS's liability by showing that

-15-

"management-level employees had actual or constructive knowledge about the existence of a sexually hostile work environment and failed to take prompt and adequate remedial action."   Id.

a.   Actual notice

It is undisputed that CVS received actual notice of the alleged harassment when Jainlett notified Margaret that she was being harassed by Giles.  However, this notice cannot establish respondeat superior liability because, upon receiving actual notice from Jainlett, CVS took effective action.  Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir. 2000) ("when an employer's response stops the harassment, there can be no employer liability under Title VII"); Kunin v. Sears Roebuck & Co., 175 F.3d 289, 294 (3d Cir. 1999).  Chichearo met with Giles and questioned him about the allegations.  Moreover, the schedule was reorganized so that Jainlett would no longer have to work with Giles.  Kunin, 175 F.3d at 294 (holding respondeat superior liability was not established where, after plaintiff complained, supervisor instructed the harasser to stay away from plaintiff and plaintiff suffered no more harassment).  Finally, Eroh, a regional manager, questioned Giles and instructed him on the company's sexual harassment policy.  Jainlett does not point to a single episode of harassment that took place after Jainlett's complaint to Margaret.

-16-

Jainlett claims that a CVS supervisor named Al informed Giles of Jainlett's accusation by telling him "that girl is tripping again," thus indicating that CVS did not take Jainlett's complaint seriously.  However, at his deposition, Giles identified Al only as a coworker, not as a supervisor or manager. Jainlett has not pointed to any evidence that Al had any responsibility for CVS's response to the alleged harassment or that his comment was anything more than a stray remark by a coworker.  Thus, Al's comment does not undermine CVS's argument that, upon being on notice of the alleged sexual harassment by Giles, it took adequate remedial action.

### b.   Constructive notice

Because CVS took effective remedial action when it received actual notice of the harassment, CVS's liability turns on whether it had constructive notice of the harassment at a time before it took remedial action.  Constructive notice occurs "where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it."[13]  Kunin v. Sears

---

[13]     Constructive notice can also be established "where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer."  Kunin, 175 F.3d at 294. However, Jainlett does not argue that she provided management with enough information to raise a probability of sexual harassment, or with any information suggesting sexual harassment, before she provided actual notice.

Roebuck & Co., 175 F.3d 289, 294 (3d Cir. 1999).  When
determining whether an employer had constructive notice of sexual
harassment, the Court considers the time span over which the
harassment took place and also whether the harassment was of a
type that would be easily noticed by an employer.  Id. at 295.
For example, in Kunin, the Third Circuit concluded that
derogatory remarks made by the harasser to plaintiff at times
when co-workers, but not management, were within hearing range
did not give rise to constructive notice, particularly since the
remarks took place intermittently over only a three-week period.
Id.

        Jainlett asserts that Giles's harassment of her was so
pervasive and open that CVS would have had to be aware of it.
She points to the following specific evidence in support of this
argument: first, two co-workers of Jainlett's, Albert LaMorgia
and Marcella Martino, were aware that Jainlett strongly disliked
Giles and that she did not like to be in his presence or talk to
him.  See Pl.'s Mem. 17.  Second, Martino overheard Giles call
Jainlett his "buddy."  Id.  Third, LaMorgia observed Giles in the
employee breakroom talking about "how Mike Tyson 'treats his
women,' including calling them "old lady."  Fourth and finally,
the simulated spanking took place in front of three co-workers.

        Jainlett has not pointed to any evidence in the record
that suggests that a CVS manager was within ear- or eyeshot at

-18-

the times when Giles harassed Jainlett.  With the exception of
the simulated spanking, the incidents of harassment are very
similar to those in <u>Kunin</u>--derogatory remarks that, if made when
management was not in earshot, would be unlikely to place CVS on
notice of the possibility of harassment.  Certainly a simulated
spanking is more easily noticed than a verbal remark, however,
Jainlett has pointed to no evidence that any manager at CVS
witnessed that incident or heard about it from the workers who
did witness it.

On this record, Jainlett has failed to provide evidence
from which a reasonable jury could conclude that Giles's
harassing behavior was "so pervasive and open that a reasonable
employer would have to be aware of it."  Because there are no
genuine issues of material fact and CVS did not have constructive
notice of Giles's harassment of Jainlett, CVS's motion for
summary judgment as to Jainlett's claim of hostile work
environment will be granted.


    C.   <u>Count II - Retaliation</u>

Jainlett argues that CVS, through Chichearo, retaliated
against her for her complaints of racial and sexual
discrimination and that CVS is therefore liable under Title VII
and 42 U.S.C. § 1981.  She claims that, after she complained of
Giles's sexual harassment, Chichearo cut back her hours at CVS,

-19-

thereby reducing her compensation.  She further claims that, when she refused to meet with Smith and Eroh about her complaint, Chichearo began to berate her, call her a "problem employee," and accuse her of attendance problems.  While yelling at her, Chichearo explicitly referred to her complaint of sexual harassment and also referenced the problems at her old store, meaning her complaint of racial discrimination.  He then wrote her up for having missed work on a number of past occasions.

Jainlett argues that Chichearo's treatment of her constitutes retaliation for her complaints of discrimination. Furthermore, she claims that his reaction was so severe that it rose to the level of a constructive discharge.

### 1.  Legal standard

Claims of retaliation in employment are governed by the familiar McDonnell Douglas framework.  Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001).  To establish a prima facie case of retaliation under Title VII, "an employee must prove that (1) she engaged in a protected employment activity, (2) her employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a "causal link" exists between the adverse action and the protected activity."  Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007). "[A] plaintiff claiming retaliation . . . must show that a

reasonable employee would have found the alleged retaliatory actions materially adverse in that they well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006).

If the employee establishes a prima facie case, the burden of production then shifts to the defendant to state a legitimate, non-discriminatory reason for the adverse employment action. Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 199 (3d Cir. 1996). If defendant satisfies this burden, plaintiff then has the opportunity to come forward with evidence sufficient to persuade a reasonable fact-finder by a preponderance of the evidence that the defendant's proffered non-discriminatory reason is merely pretextual. Id. Plaintiff must produce some evidence from which a jury could conclude that "retaliatory animus" was the cause for the adverse act. Moore, 461 F.3d at 342. At all times, the burden of persuasion remains with the plaintiff. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 799 n.10 (3d Cir. 2003). "'The ultimate question in any retaliation case is an intent to retaliate vel non.'" Moore, 461 F.3d at 342 (quoting Jensen v. Potter, 435 F.3d 444, 449 n.2 (3d Cir. 2006)).

Here, it is undisputed that Jainlett engaged in a protected employment activity when she complained to CVS management about Giles's sexual harassment. See Moore, 461 F.3d

at 343 ("Opposition to discrimination can take the form of informal protests . . . including making complaints to management."). Therefore, the Court proceeds to examine whether Jainlett has proffered sufficient evidence of the second two elements of retaliation to survive defendant's motion for summary judgment.

Jainlett testified that, after she complained of sexual harassment, her hours at CVS were reduced and she was falsely accused of violating CVS attendance policies. If believed, this testimony would establish that Jainlett suffered adverse employment actions. Jainlett has offered sufficient evidence from which a jury could find in her favor on the second prong of the retaliation test.

Third, Jainlett has provided evidence sufficient to permit a jury to conclude that there was a causal connection between her complaint of harassment and the adverse employment action. Jainlett testified that her reduction in hours came almost immediately after her report of sexual harassment. Timing alone is normally insufficient to raise an inference of causation, however, the Third Circuit has recognized that causation may be established by timing alone where the adverse employment action follows the complaint of discrimination almost immediately. See Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001) (holding timing is rarely sufficient to raise

inference of causation); <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708
(3d Cir. 1989) (holding that timing of termination two days after
employer learned of EEO complaint raised inference of causation).
Here, the timing of Jainlett's reduction in hours is suggestive,
but Jainlett does not rely on timing alone.

During the discussion in which Jainlett was accused of
attendance problems, Chichearo, her supervisor, expressly
referred to Jainlett's problems at her old store and described
her as a "problem employee."  Drawing all reasonable inferences
in Jainlett's favor, as is required at the summary judgment
stage, the Court concludes that Chichearo may have been referring
to Jainlett's prior complaint of discrimination when he mentioned
the past problems.  This inference is supported by the fact that
Chichearo had already mentioned Jainlett's complaint of sexual
harassment before saying the problems from her old store were
repeating themselves.

Moreover, Chichearo then accused Jainlett of being late
even though, under the grace period policy he had applied to her
in the past, she should not have been considered late.
Chichearo's negative references to Jainlett's complaints of
discrimination and the temporal proximity between her complaint
of harassment, the decrease in her hours, and his refusal to
afford her the grace period given to other employees are
sufficient to allow an inference that there was a causal

-23-

connection between her complaints of discrimination and the
adverse actions.

Because Jainlett has established a prima facie case of
retaliation, the burden of production shifts to CVS to articulate
a legitimate, non-discriminatory reason for the reduction in
Jainlett's hours.  CVS has produced evidence that Jainlett's
hours were reduced because the Christmas busy season had ended
and employees' hours were being reduced company-wide.  Bellingham
Dep. 59:19-24.  Moreover, CVS maintains that Chichearo's
legitimate reason for reprimanding Jainlett on January 13, 2005
is that she did arrive late or skip work on the occasions in
question.  Chichearo Dep. 104-05; 109-110.

However, even assuming that CVS has met its burden of
production, Jainlett in turn has pointed to evidence that would
allow a jury to conclude that CVS's non-discriminatory reason was
merely a pretext.  Jainlett testified that her complaint was
earlier than CVS acknowledges; that she was forced to stay home,
unpaid, while CVS investigated; that she was not late on the
occasions complained of by Chichearo; and that her hours were
reduced in November, before the Christmas busy season ended.
This testimony provides a basis for concluding that CVS's
proffered legitimate reason for terminating Jainlett is mere
pretext.  If a jury credits the testimony, it could conclude that
CVS terminated Jainlett because she complained of sexual

harassment after having already complained of racial discrimination.

Because Jainlett has offered evidence sufficient to allow a reasonable jury to conclude that CVS retaliated against her for her complaints of sexual and racial discrimination, CVS's motion for summary judgment as to this claim will be denied.

## 2.   Constructive discharge

> Constructive discharge occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.  A hostile work environment will not always support a finding of constructive discharge.  To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.

Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006).  For example, in Goss v. Exxon Office Systems Co., plaintiff was a successful sales representative with a lucrative territory.  747 F.2d 885, 888 (3d Cir. 1984).  Over a period of time, her supervisor verbally abused her regarding her intention to have a child.  Id.  When plaintiff became pregnant (and shortly after she had secured a large contract), her supervisor questioned her abilities and particularly stated that he doubted she would be able to manage motherhood and a career.  Id.  On another occasion, he expressed the same doubts so strongly that

-25-

she was left in tears.  Id.

Plaintiff sought redress with higher levels of management pursuant to the company's "open door" policy, but to no avail.  Id.  After several meetings regarding her concerns with her supervisor, plaintiff was informed that she was being removed from her territory.  Id.  She was told that her options were to accept another far less attractive, less lucrative territory or to quit.  Id.  Under these circumstances, the court concluded that there was enough evidence to support the jury's conclusion that plaintiff had been constructively discharged. Id. at 889.

The situation described by Jainlett is far less severe than the facts of Goss.  First, unlike the situation in Goss, Jainlett's complaint of sexual harassment was promptly and adequately remedied.  Second, the offensive comments by Chichearo took place during a single meeting.  Third, Jainlett's hours were reduced, but this reduction was not permanent.  Neither party disputes that the schedule at CVS changed on a regular basis and that Jainlett's hours varied over time.  Thus, although Jainlett's hours were reduced, this was not the permanent change made in Goss.  Nor was the change in hours presented in such a confrontational manner: accept the reduced hours or quit.

Although Jainlett protested the reduction in her hours to Chichearo, there is no sign that she sought assistance from

-26-

someone above Chichearo, whereas the plaintiff in <u>Goss</u> sought help through several levels of management.  Jainlett did not even call the company's "ethics hotline" as she had done in the past. Under these circumstances, a reasonable jury could not conclude that the conditions faced by Jainlett were so intolerable that a reasonable employee facing the conditions would leave the job. Therefore, CVS's motion for summary judgment will be granted as to Jainlett's claim of constructive discharge.

III. CONCLUSION

        For the reasons stated above, CVS's motion for summary judgment will be granted in part and denied in part.  The motion will be denied as to Jainlett's claim of retaliation for her complaints of sexual and racial discrimination.  The motion will be granted as to Jainlett's remaining claims.  An appropriate order will follow.

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DONNA JAINLETT,                    :    CIVIL ACTION
                                   :    NO. 06-4196
          Plaintiff,              :
                                   :
          v.                       :
                                   :
CVS CORPORATION t/a                :
CVS PHARMACY,                      :
                                   :
          Defendant.               :
                                   :
```

O R D E R


      **AND NOW**, this **30th day of July 2008**, it is hereby **ORDERED** that, for the reasons stated in the accompanying memorandum, defendant's motion for summary judgment is **GRANTED** except as to plaintiff's claim of retaliation for her complaints of sexual and racial discrimination.

      **AND IT IS SO ORDERED.**


      **S/Eduardo C. Robreno**

      **EDUARDO C. ROBRENO, J.**